***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford and enters the following Opinion and Award:
 *********** *Page 2 
As set forth in the Pre-Trial Agreement and Deputy Commissioner Ledford's September 15, 2010 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Whether the Form 24 filed by defendant Federated should be granted?
2. Whether the Form 24 was filed without a reasonable basis, so as to justify attorneys fees pursuant to N.C. Gen. Stat. § 97-88.1?
3. Whether plaintiff is entitled to ongoing compensation for total disability and if so, which carrier is responsible for payment of the same?
4. Whether the second accident of November 29, 2005, significantly aggravated plaintiff's lower back injury and if so, is the carrier on the risk at the time, Federated, therefore liable for the consequences?
5. Whether plaintiff is entitled to a second opinion on treatment options for his neck with Dr. Tim Adamson or some other physician at Carolina Neurosurgery Spine?
6. Is plaintiff in need of additional medical treatment for his injuries?
7. Whether defendants (one or both of the carriers) should pay for plaintiff's education as reasonable vocational rehabilitation?
8. Whether plaintiff's average weekly wage should be adjusted upward to $688.00 in the second accident, I.C. No. 579531, since plaintiff's average weekly wage in the first accident, I.C. No. 452949, was adjusted upward to the maximum compensation rate of $688.00?
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS *Page 3 
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk for defendant in I.C. No. 452949 was Brentwood Services Administrators, Inc.
5. The carrier on the risk for defendant in I.C. No. 579531 was Federated Mutual Insurance Company.
6. Plaintiff sustained an admittedly compensable injury on August 4, 2004, arising out of and in the course and scope of his employment (with defendant-employer). [I.C. No. 452949].
7. Plaintiff sustained an admittedly compensable injury on November 29, 2005, arising out of and in the course and scope of his employment (with defendant-employer) and the same was admitted on a Form 60 dated December 12, 2005 [I.C. No. 579531], but liability for treatment of low back pain was denied by Form 61 dated September 6, 2006.
8. An employment relationship existed between plaintiff-employee and defendant-employer on August 4, 2004, and November 29, 2005.
9. The employee's average weekly wage and compensation rate in I.C. No. 452949 was the issue of an earlier hearing and was adjusted from $492.57 to the maximum compensation rate of $688.00. *Page 4 
10. The employee's average weekly wage in I.C. No. 579531 is $964.24, yielding a compensation rate of $642.86, but was determined before the compensation rate was adjusted for the first injury in I.C. No. 452949.
11. Plaintiff filed a Form 33 Request for Hearing in I.C. No. 452949 on January 11, 2008, citing that "defendants have failed to upwardly adjust plaintiff's temporary total disability benefits."
12. Defendant Brentwood Services Administrators filed a Form 33R in I.C. No. 452949 on March 24, 2008, citing that "plaintiff is being paid the accurate weekly compensation amount."
13. Defendant Brentwood Services Administrators, after adjusting to the maximum compensation rate, has paid temporary total disability benefits at a weekly compensation rate of $688.00 from August 28, 2007, to January 5, 2009.
14. Defendant Federated Mutual Insurance Company paid temporary total disability benefits at a weekly compensation rate of $642.86 from November 29, 2005, to August 28, 2007, when defendant Brentwood Services Administrators began paying temporary total disability benefits due to low back surgery. Defendant Federated Mutual Insurance Company resumed payment of temporary total disability benefits in the amount of $642.86 on December 31, 2008, and those benefits continue to be paid.
15. Defendant Brentwood Services Administrators filed an amended Form 33R in I.C. No. 452949 on June 30, 2008, citing that "plaintiff is being paid the accurate weekly compensation amount. Defendants Toby Wells Pontiac Buick and Brentwood Services Administrators also contend that plaintiff's current disability is not due to his August 4, 2004 injury. Instead, plaintiff's current disability was caused by accidents occurring on June 3, 2005, *Page 5 
and/or November 29, 2005. Alternatively, in the event that the Industrial Commission finds that plaintiff's disability was not materially aggravated by accidents occurring on June 3, 2005, and/or November 29, 2005, defendants Toby Wells Pontiac Buick and Brentwood Services contend that plaintiff's current disability should be shared equally or apportioned by Brentwood Services and Federated Mutual Insurance Company. (Federated Mutual Insurance Company was providing workers' compensation insurance coverage to Toby Wells Pontiac Buick on or around January 1, 2005.)"
16. Defendant Brentwood Services Administrators filed a Motion to Add Party-Defendant Federated Mutual Insurance Company to I.C. No. 452949 on June 30, 2008.
17. Counsel for plaintiff filed a Motion to Consolidate on July 11, 2008, requesting that I.C. No. 452949 be consolidated with I.C. No. 579531.
18. On July 13, 2008, defendant Federated Mutual Insurance Company in I.C. No. 579531 filed its response to both the Motion to Add Federated Mutual Insurance Company and plaintiff's Motion to Consolidate the claims.
19. Executive Secretary Tracey H. Weaver filed an Order on August 18, 2008, denying defendant Brentwood Services Administrators' Motion and granting plaintiff's Motion to Consolidate.
20. Mediation was held and impassed on September 29, 2008.
21. Defendant Federated Mutual Insurance Company in I.C. No. 579531 filed a Form 24 Application on June 2, 2009, to which plaintiff responded on June 29, 2009, and defendant Brentwood Services Administrators responded on July 6, 2009. *Page 6 
22. On June 29, 2009, counsel for plaintiff submitted a request to Docket Director Linda Langdon that I.C. Nos. 452949 and 579531 be re-calendared for hearing before the Industrial Commission.
23. On June 30, 2009, counsel for plaintiff submitted a follow-up correspondence to Ms. Langdon confirming that the issues presented in plaintiff's Form 33 Request for Hearing dated January 14, 2008, had not materially changed and renewing his request that I.C. Nos. 452949 and 579531 be re-calendared for hearing before the Industrial Commission.
24. An informal telephonic hearing was held with Special Deputy Commissioner Jennifer S. Boyer on July 14, 2009.
25. Special Deputy Commissioner Boyer entered an Administrative Decision and Order on July 21, 2009, indicating that the Industrial Commission was unable to reach a decision on the Form 24 Application following an informal hearing and that the matter would be placed on the formal hearing docket.
26. The parties certify that all pre-trial discovery has been completed and all relevant documents have been exchanged.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the hearing date, plaintiff was thirty-eight (38) years of age, having a birth date of April 14, 1972. Plaintiff is a high school graduate and also has an associate's degree in auto mechanics from a community college. *Page 7 
2. Plaintiff was employed as an auto mechanic technician by defendant-employer. He had worked for defendant-employer for approximately six (6) years and six (6) months as of the date of his first accident.
3. Plaintiff was initially injured on the afternoon of August 4, 2004, while working for defendant-employer. Plaintiff was installing a transmission when the alignment shifted, causing the transmission to fall. Plaintiff caught the falling transmission and felt immediate pain in his lower back.
4. Brentwood Services Administrators, Inc. ("Brentwood") was the servicing agent for the self-insured North Carolina Auto Dealers Association, who was on the risk for the August 4, 2004 accident. Although Brentwood paid medical benefits, no Form 60 was filed with the Commission until September 6, 2007, when plaintiff underwent surgery.
5. Plaintiff eventually came under the care of Dr. James Rice of Sandhills Orthopaedic and Spine Clinic, whom he first saw on October 6, 2004. A lumbar MRI performed on December 18, 2004, revealed a left paracentral disc bulge at L5-S1 causing mild spinal canal and left neuroforaminal compromise.
6. Dr. Rice treated plaintiff conservatively with steroid injections, pain medicine, and physical therapy. On February 25, 2005, plaintiff received a lumbar epidural steroid injection administered by Dr. Lawrence B. Place at FirstHealth of the Carolinas in Pinehurst, North Carolina. On March 2, 2005, plaintiff reported to Dr. Rice that he had much improvement following the epidural steroid injection. Dr. Rice refilled plaintiff's prescription for Lorcet. Dr. Rice allowed plaintiff to continue to work as an auto mechanic. At plaintiff's visit to Dr. Rice on April 1, 2005, plaintiff began to complain of left leg pain. *Page 8 
7. On May 23, 2005, Dr. Rice reported that physical therapy had improved plaintiff's condition. Dr. Rice and his physician's assistant, Charles R. Kelly, noted that plaintiff had chronic back pain and perceived dysesthesia, numbness, and tingling in his left leg. Dr. Rice was aware and noted that plaintiff continued to work as an auto mechanic. However, by this time, plaintiff was experiencing chronic pain due to the accident of August 4, 2004, and his pain was aggravated whenever he did heavy lifting at work.
8. At plaintiff's June 3, 2005 visit with Dr. Rice, plaintiff's back pain had been aggravated by lifting a heavy engine at work. Due to plaintiff's complaints, Dr. Rice ordered a repeat lumbar MRI scan and restricted plaintiff to no lifting more than twenty (20) pounds, with limited bending, stooping, standing, walking, and frequent change of position. Plaintiff did not file a claim alleging a work injury on June 3, 2005, and the evidence does not establish this as a significant aggravating factor in the development of plaintiff's back pain.
9. The results of the MRI were very similar to the December 2004 MRI and consistent with plaintiff's complaints of left leg pain. After reviewing the MRI results, on June 29, 2005, Dr. Rice gave plaintiff an indefinite lifting restriction of fifty (50) pounds with limited bending, stooping, and frequent change of positions. Plaintiff would follow-up in two months.
10. Plaintiff saw Dr. Rice on August 30, 2005, at which time the diagnosis was degenerative disc disease. Although steroid injections had brought plaintiff pain relief, it was not long-lasting, and Dr. Rice decided against a third round of injections. Dr. Rice continued plaintiff's work restrictions and medications.
11. On November 23, 2005, plaintiff returned to Dr. Rice with complaints of ongoing problems with his back and left leg, and reported that he was working and taking an occasional *Page 9 
Lorcet and Flexeril. Dr. Rice continued to monitor plaintiff's ongoing complaints and refilled his prescriptions for Lorcet and Flexeril, with a note to follow-up in two months.
12. Plaintiff continued to work for defendant-employer in the year following this injury. He worked under restrictions, and because heavy lifting caused pain, he was not able to perform as much work as previously. Plaintiff was paid on commission by production, and his production was reduced due to his limitations from his back injury.
13. On November 29, 2005, plaintiff was changing a tire when he slipped on the cement floor while carrying the tire. Plaintiff's whole body landed on the floor, and the tire struck plaintiff about his head and neck, causing a laceration on his head, and a brief loss of consciousness.
14. As of the November 29, 2005 accident, defendant-employer was insured with Federated Mutual Insurance Company ("Federated"). The Form 19 completed by employer indicated that plaintiff had a cut on his head and "whole body sore — back and leg, headache."
15. On December 12, 2005, Federated filed a Form 60 admitting the November 29, 2005 accident as compensable, with a description of injuries to plaintiff's head, back, neck, left shoulder, and leg. The Form 60 also indicated that plaintiff was being paid based on an average weekly wage of $964.24 and a compensation rate of $642.86, and that compensation commenced on December 12, 2005.
16. Plaintiff was written out of work following the November 29, 2005 accident and Federated began payment of temporary total disability ("TTD") benefits effective November 29, 2005.
17. Plaintiff was seen on the date of his injury at Sandhills Urgent Care complaining of headache and mild nausea. Plaintiff gave a history of slipping in the service department while *Page 10 
carrying a tire, and that when he fell, the tire struck him on the head. Plaintiff was assessed with a concussion and treated for a small laceration and superficial abrasion to the scalp. Plaintiff declined suturing as he did not want to have hair removed. Plaintiff was written out of work for a few days and prescribed Lorcet Plus, Phenergan, and Keflex.
18. On December 1, 2005, plaintiff reported the new injury to Dr. Rice, complaining primarily of left shoulder pain. Dr. Rice wrote plaintiff out of work until December 9, 2005, and continued plaintiff's pain medications.
19. On December 5, 2005, plaintiff began a course of shoulder therapy at First Health of the Carolinas. On December 8, 2005, Dr. Rice noted left shoulder inflammation, left neck and arm pain, occipital headaches, and numbness in plaintiff's ring and little fingers. Dr. Rice prescribed aggressive physical therapy, Motrin, Flexeril, and Lorcet, and wrote plaintiff out of work until January 6, 2006.
20. On January 6, 2006, plaintiff returned to Dr. Rice complaining of neck and left shoulder pain. Dr. Rice ordered an EMG, a cervical MRI, a physical therapy consultation, and prescribed Lyrica. On January 17, 2006, Dr. Rice indicated he would await plaintiff's MRI scan and NCV results before proceeding with physical therapy for plaintiff's cervical spine. Dr. Rice refilled plaintiff's medications.
21. On January 18, 2006, plaintiff underwent the recommended cervical MRI. On or about January 23, 2006, plaintiff underwent the recommended nerve conduction and EMG studies. On January 30, 2006, plaintiff was discharged from shoulder therapy.
22. On February 7, 2006, Dr. Rice reviewed the MRI and noted diffuse posterior cervical HNPs at C2 through C7 most prominent at C5-6 to the left. Dr. Rice reported that the nerve conduction velocity studies revealed decreased conduction at C8 and T1. Dr. Rice *Page 11 
intended to refer plaintiff to Dr. Dion J. Arthur of Premier Orthopedics Spine Specialists in Hamlet, North Carolina, for therapeutic considerations. Dr. Rice continued plaintiff out of work until March 7, 2006.
23. On February 20, 2006, Dr. Dion J. Arthur evaluated plaintiff for his chief complaints of neck pain and left arm pain and weakness. Dr. Arthur examined plaintiff and reviewed all the radiological data. Dr. Arthur concluded plaintiff had failed extensive conservative management and discussed micro-surgical decompression and instrumented fusion options with plaintiff.
24. On March 7, 2006, Dr. Rice reported that Dr. Arthur was recommending anterior cervical fusion. Dr. Rice noted that plaintiff was out of work pending cervical surgery. Dr. Rice ordered an MRI scan of the left shoulder to rule out significant rotator cuff problems. On March 20, 2006, plaintiff underwent an MRI of his left shoulder that revealed mild degenerative changes of the AC joint and an equivocal small tear of the anterior horn of the glenoid labrum.
25. The carrier sent plaintiff to Dr. Alfred Rhyne of OrthoCarolina for a second opinion as to plaintiff's cervical condition. Dr. Rhyne examined plaintiff on May 24, 2006, and assessed plaintiff with neck pain, mild chronic C8 radiculopathy, and degenerative disc disease C5-6 and C6-7, without signs of cord compromise, and possible intrinsic left shoulder pathology. Dr. Rhyne recommended physical therapy for plaintiff's neck and prescribed Naprosyn. He recommended Dr. Roy Majors for assessment of plaintiff's left shoulder. Dr. Rhyne recommended light duty work restrictions with no lifting more than twenty (20) pounds and no prolonged reaching overhead or extreme positions of the neck.
26. On June 5, 2006, plaintiff was seen by Dr. Roy Majors with OrthoCarolina, with a chief complaint of left shoulder pain since November 29, 2005, that was dull and aching in *Page 12 
nature, significantly popped with motion, woke him up at night, and was aggravated by reaching and grasping. Upon examination, Dr. Majors found pain and decreased range of motion with pain; that the left shoulder revealed positive impingement, an active click with abduction, and tenderness at the AC joint. Dr. Majors also noted that true AP, AC and outlet views showed AC arthrosis with type III acromion; and that the MRI showed AC arthrosis with what appeared to be anterior horn glenolabral tear and thickened subacromial bursa.
27. Dr. Majors assessed plaintiff with subacromial impingement with AC arthrosis of the left shoulder. He discussed both surgical and nonsurgical treatment with plaintiff and indicated that plaintiff wanted to proceed with arthroscopic decompression and AC resection, and possible repair or debridement of the labral tear.
28. On June 15, 2006, plaintiff underwent arthroscopic subacromial decompression of the left shoulder, AC resection left side, and debridement of the torn portion of subscap tendon tear of the left shoulder, which was performed by Dr. Majors.
29. Plaintiff returned to Dr. Majors on June 16, 2006, with a chief complaint of left shoulder pain. Dr. Majors noted that plaintiff would begin aggressive therapy and that he would remain out of work.
30. On July 10, 2006, plaintiff returned to Dr. Rhyne and reported continued pain and discomfort surrounding the neck and lots of headaches. Dr. Rhyne recommended continued therapy because the prior therapy had been interrupted by the shoulder surgery.
31. Plaintiff was also seen by Dr. Majors on July 10, 2006, with a chief complaint of left shoulder soreness. Dr. Majors recommended that plaintiff continue with aggressive therapy and that plaintiff would be kept at modified work, away from heavy pushing, pulling, twisting, and reaching above the plane of his shoulder. Dr. Majors further specified restrictions of no *Page 13 
prolonged reaching overhead or extreme positions of the neck; no lifting over zero (0) pounds above shoulder level; no lifting over five (5) pounds waist to shoulder; and no lifting over ten (10) pounds floor to waist.
32. On August 7, 2006, Dr. Majors changed these restrictions for the left shoulder to no lifting greater than twenty-five (25) pounds with the left; no pushing or pulling greater than twenty (20) pounds with the left; and no prolonged reaching overhead or extreme positions of the neck.
33. Plaintiff continued to treat with Dr. Rice's office during this entire period of time for his low back pain and left leg pain. He also continued to participate in physical therapy for his left shoulder and his cervical spine. He remained totally out of work because defendant-employer had no work within his restrictions. Plaintiff was terminated on August 9, 2006, because defendant-employer could not accommodate him.
34. On August 23, 2006, Dr. Rhyne indicated that plaintiff could return to work with no excessive overhead looking and no prolonged reaching overhead or extreme positions of the neck. He also referred plaintiff to Dr. Anthony Wheeler for a neurology consultation for the frontal headaches, which Dr. Rhyne believed were related to the November 29, 2005 accident.
35. On September 6, 2006, defendant Federated, in I.C. No. 579531, filed a Form 61 indicating that the claim for the back injury of November 29, 2005, was denied because treatment for the low back pain did not appear to be related to the workers' compensation injury of November 29, 2005.
36. On October 23, 2006, plaintiff presented to Pain and Orthopedic Neurology where he was seen by Dr. Anthony Wheeler on referral from Dr. Rhyne for assessment of his headaches. On examination, Dr. Wheeler noted mild soft tissue dysfunction in the cervical *Page 14 
paraspinal muscles consisting of mild diffuse spasm; full cervical rotation in both directions; full shoulder range of motion; negative impingement of left shoulder; and intact rotator cuff muscles. Dr. Wheeler diagnosed post-traumatic and cervicogenic tension-type headaches occurring daily, doubtful for serious intracranial dysfunction.
37. Plaintiff returned to Dr. Majors on October 30, 2006, with a chief complaint of left shoulder soreness. Plaintiff was doing better, but still felt a sense of looseness, popping and clicking in his shoulder. He had undergone an injection that helped some, but he still had decreased motion of the neck.
38. Dr. Majors indicated that plaintiff had reached maximum medical improvement and assigned a total impairment of seven percent (7%) to the left upper extremity. He did not place specific restrictions on plaintiff, but indicated that overhead work would most likely irritate plaintiff's shoulder.
39. Plaintiff continued to treat with Dr. Wheeler's office for his headaches and Dr. Rice's office for his back and left leg pain. Both continued him on pain medication. Dr. Wheeler's office requested authorization to perform Botox injections on plaintiff for his continued headaches, but defendant Federated did not approve this treatment.
40. Plaintiff also participated in physical therapy at the recommendation of Dr. Wheeler, and this helped his daily headaches somewhat. Unfortunately, after physical therapy ended, he was not able to produce the same results with his home exercises.
41. During this period of time after plaintiff was terminated from his employment with defendant-employer, he searched for suitable employment on his own. He kept a log of all of the places that he sought employment. *Page 15 
42. On February 26, 2007, defendant Federated initiated vocational rehabilitation with Joanna Howell, MRC, CRC, CRP. When she met with plaintiff on March 8, 2007, Ms. Howell noted, and the Full Commission finds, that plaintiff had been participating in an independent job search over the past eight (8) to nine (9) months, had documentation of his activities as well as a current resume, and that plaintiff expressed an interest in returning to school for additional training in either a medical field or more specific training in automobile computer systems.
43. Plaintiff participated in vocational rehabilitation with Ms. Howell from March 8, 2007, through August 6, 2007. During this period of time, plaintiff and Ms. Howell performed an extensive job search for suitable employment for plaintiff. Both expressed frustration over the lack of job leads for plaintiff given his work history, education, restrictions, and the local market in which he lived.
44. Ultimately, plaintiff and Ms. Howell both came to the conclusion that further job search was futile and that plaintiff should look into retraining so that he could obtain suitable employment. Ms. Howell identified computer courses for plaintiff, while plaintiff identified medical courses.
45. The greater weight of the evidence establishes that plaintiff performed a most reasonable job search on his own for eight to nine months, and with the assistance of Ms. Howell for an additional period of time, and that further job search efforts would have been futile for him without the benefit of retraining. He also pursued all vocational efforts identified by Ms. Howell, including additional education.
46. The greater weight of the evidence further establishes that the medical sonography degree that plaintiff identified for himself is more likely to lead him to suitable employment than the computer programming and engineering degrees that Ms. Howell identified. The computer-related *Page 16 
degrees have starting salaries of approximately $30,000 per year, whereas the medical sonography positions offer salaries closer to plaintiff's pre-injury wages of $54,000 per year prior to his first injury by accident. It also appears that more job opportunities will be available to plaintiff with a medical sonography degree than with the computer-related degrees.
47. Plaintiff's back pain and left leg pain continued to progress during this period of time, as did his headaches. Plaintiff continued to treat with Dr. Wheeler's office for his headaches and Dr. Rice's office for his back and left leg pain. Both continued him on pain medication. The Botox injections were still not authorized.
48. A third MRI scan of plaintiff's lumbar spine was performed on July 23, 2007, at Southern Pines Diagnostic Imaging. This MRI showed a large herniated disc ("HNP") at L5-S1 to the left of the midline compressing the thecal sac. This was the first significant change in plaintiff's lumbar MRI scans.
49. After reviewing the MRI results, Dr. Rice discussed with plaintiff the possibility of lumbar surgery. On August 29, 2007, Dr. Rice took plaintiff out of work, pending surgery. Dr. Rice performed plaintiff's surgery, a left L5-S1 Metrix discectomy with the removal of an extruded portion of disc material, on August 31, 2007, at Moore Regional Hospital. Plaintiff was discharged the same day.
50. On August 15, 2007, defendant Federated, in I.C. No. 579531, filed a Form 61 indicating that temporary total disability payments would be denied after August 28, 2007, as plaintiff would begin receiving temporary total disability payments from another carrier on that date for a previous injury. *Page 17 
51. On August 27, 2007, defendant Federated, in I.C. No. 579531, filed another Form 61 indicating that medical bills related to the lumbar injury treatment were denied as they were not related to the workers' compensation injury of November 29, 2005.
52. On September 6, 2007, defendant Brentwood, in I.C. No. 452949, filed a Form 60 indicating the admission of plaintiff's right to compensation for an injury of August 4, 2004; that plaintiff was out of work for upper back surgery; that plaintiff was paid for the entire day of the injury; that the average weekly wage was $738.82; that the compensation rate was $492.57; and that compensation commenced on August 28, 2007.
53. On September 28, 2007, Dr. Rice assigned restrictions of light duty work as of October 1, 2007; limited bending, stooping, standing, and walking; frequent change of position; no lifting greater than ten (10) pounds; and no stairs or ladders. Dr. Rice also recommended physical therapy for plaintiff's back.
54. On October 1, 2007, plaintiff, by and through counsel, in I.C. No. 452949, sent correspondence to claims representative Kim Nelson advising that plaintiff was receiving temporary total disability benefits in the amount of $492.57 per week; that the Form 22 reflected yearly earnings of $54,114.37; that the Form 19 documented hourly earnings of $20.75; and that it appeared that plaintiff was not being paid at the correct compensation rate, which should be $688.00 per week, the maximum rate set by the Industrial Commission for 2004.
55. On October 30, 2007, plaintiff, by and through counsel, in I.C. No. 452949, sent a follow-up correspondence to claims representative Kim Nelson advising that it did not appear that plaintiff was being paid at the correct compensation rate of $688.00 and requesting a properly executed Form 22 wage chart and a properly executed Form 60. *Page 18 
56. On November 30, 2007, Dr. Rice assigned restrictions of limited bending, stooping, standing, and walking; frequent change of position; and no lifting greater than ten (10) pounds. Dr. Rice also recommended physical therapy for plaintiff's back.
57. On January 11, 2008, plaintiff, by and through counsel, filed a Form 33 Request for Hearing in I.C. No. 452949, indicating that defendants had failed to upwardly adjust plaintiff's temporary total disability benefits. This was ultimately resolved via a consent order and defendant Brentwood adjusted plaintiff's compensation rate to the maximum for that year of $688.00 per a Form 62.
58. Plaintiff started school to get his prerequisites for medical sonography in the spring semester of 2008. The Full Commission finds that this constitutes reasonable vocational rehabilitation efforts given the futility of plaintiff's prior job search. Plaintiff's counsel previously requested approval for this, but defendant Federated did not respond.
59. On February 6, 2008, Dr. Rice indicated light duty work and assigned restrictions of limited bending, stooping, standing, and walking; frequent change of position; and no lifting greater than twenty (20) pounds.
60. On March 10, 2008, Dr. Rice assigned restrictions of return to work light duty, limited bending, stooping, standing, and walking; frequent change of position; and no lifting greater than twenty-five (25) pounds. He assigned plaintiff with a ten percent (10%) partial impairment rating to his spine and released him at maximum medical improvement.
61. On June 30, 2008, defendant Brentwood, in I.C. No. 452949, filed an amended Form 33R citing that plaintiff was being paid the accurate weekly compensation amount; that defendants Toby Wells Pontiac Buick and Brentwood Services Administrators contended that plaintiff's current disability was not due to his August 4, 2004 injury; that plaintiff's current *Page 19 
disability was caused by accidents occurring on June 3, 2005, and/or November 29, 2005; that in the event that the Industrial Commission found that plaintiff's disability was not materially aggravated by accidents occurring on June 3, 2005, and/or November 29, 2005, defendants Toby Wells Pontiac Buick and Brentwood contended that plaintiff's current disability should be shared equally or apportioned by defendant Brentwood and defendant Federated, as defendant Federated was providing workers' compensation insurance coverage to Toby Wells Pontiac Buick on or about January 1, 2005.
62. On July 11, 2008, plaintiff, by and through counsel, filed a response to defendant Toby Wells Pontiac Buick GMC and Brentwood's Motion to Add Party-Defendant requesting that the Commission enter an Order consolidating I.C. No. 579531 with I.C. No. 452949, and that defendant Brentwood's Motion to Add Federated Mutual Insurance Company as a Party to I.C. No. 452949 be denied.
63. Plaintiff ultimately underwent a second left shoulder surgery performed by Dr. Majors. On December 18, 2008, Dr. Majors performed the following: arthroscopic subacromial decompression, left shoulder; AC resection, left side; and subscap tendon repair, left shoulder.
64. On December 31, 2008, defendant Federated filed a Form 60 in IC No. 579531, indicating that temporary total disability benefits in the amount of $642.86 per week were reinstated as of December 18, 2008, due to additional surgery and that compensation commenced on December 31, 2008.
65. On January 6, 2009, Brentwood Services filed a Form 61 in IC No. 452949, indicating that temporary total disability benefits paid by Brentwood Services would end on January 5, 2009, due to plaintiff's receipt of temporary total disability benefits from another carrier. Brentwood has not paid temporary total disability benefits to plaintiff since January 5, 2009, *Page 20 
and Federated has paid plaintiff ongoing temporary total disability benefits since December 31, 2008.
66. On January 9, 2009, Dr. Majors assigned plaintiff the following restrictions: return to work with restrictions on January 12, 2009; no lifting over zero (0) pounds above shoulder level on the left; no lifting over one (1) pound waist to shoulder on the left; and no lifting over two (2) pounds floor to waist on the left. Dr. Majors also prescribed physical therapy.
67. At his April 3, 2009 visit with Dr. Majors, plaintiff was making progress through physical therapy, but still experiencing weakness and discomfort with movement. Dr. Majors prescribed "3 more weeks of aggressive strengthening and progressive plyometric proprioceptive training." Dr. Majors planned to release plaintiff for full work duty as of May 4, 2009, with a return visit to see him afterward on May 18. At plaintiff's visit on May 18, 2009, Dr. Majors made no changes to his release to work without restrictions, and on June 29, 2009, Dr. Majors signed a work status form stating the same.
68. On June 2, 2009, defendant Federated filed a Form 24 Application to terminate benefits indicating that plaintiff had been released to return to work full duty with regard to his shoulder injury. Defendant Federated contended that he was no longer disabled within the meaning of the Act and no longer met the definition of disability. Plaintiff's response was filed through counsel on June 29, 2009.
69. On June 24, 2009, Dr. Rice released plaintiff to light duty work with the following restrictions: limited bending, stooping, standing, and walking; frequent change of position; no lifting greater than twenty-five (25) pounds; and long term restrictions based on the Functional Capacity Evaluation of February 20, 2008. *Page 21 
70. On July 6, 2009, counsel for defendant Brentwood filed a response to defendant Federated's Form 24 Application and contended, like plaintiff, that defendant Federated's Form 24 was inappropriate and should be denied for many reasons.
71. On July 21, 2009, an Administrative Decision and Order was entered by Special Deputy Commissioner Jennifer S. Boyer indicating that the Industrial Commission was unable to reach a decision on the Form 24 Application following an informal hearing and that the matter would be placed on the formal hearing docket.
72. Although defendant Brentwood accepted plaintiff's initial claim as compensable for his lower back, the Form 60 was not filed until September 6, 2007.
73. Plaintiff has enrolled in community college, with an estimated graduation date in 2012. He is applying for a two-year degree program in sonography, but must first complete preliminary coursework in order to qualify for the program. This is essentially the same coursework that would be required for an associate's degree in the computer programs. Plaintiff had the opportunity to "shadow" a sonographer working at Anson Community Hospital, and plaintiff found that he would be physically able to do this job.
74. Registration/tuition statements from South Piedmont Community College, receipts for textbooks and supplies, and mileage documentation to and from the South Piedmont Community College campus, were presented as exhibits at the hearing of this matter to reflect the out-of-pocket expenses paid by plaintiff for his education and retraining.
75. As was also noted by Dr. Rice, the Full Commission likewise finds plaintiff to be a credible witness. Plaintiff investigated and found that he would have better opportunities for a higher salary and more employment opportunities in the field of health care, with a sonography degree, than with a two-year associate's degree in computer technology. Plaintiff's testimony in *Page 22 
this regard is found credible and persuasive, and the Full Commission finds that plaintiff's chosen course of study is reasonable vocational rehabilitation.
76. Plaintiff testified, and the Full Commission finds, that he is still having pain in his back and leg, despite surgery. He is continuing to have headaches, almost daily since his November 29, 2005 accident. He testified, and the Full Commission finds, that he has experienced left hand symptoms of numbness in his small, ring, and half of the middle finger on the left hand since the November 29, 2005 accident.
77. On December 9, 2009, the parties took the deposition testimony of Dr. James E. Rice, the authorized treating physician for plaintiff's lumbar injury. Dr. Rice was very clear in his testimony concerning the nature of plaintiff's injuries and his opinion as to the contributions of the first accident and the second accident to plaintiff's lumbar condition. Dr. Rice was really the only physician who treated plaintiff's lumbar injury and the only one to render an opinion on the same to a reasonable degree of medical probability.
78. As established by the greater weight of the medical evidence, and in particular the testimony of Dr. Rice, the initial injury of August 4, 2004, caused injury to plaintiff's lumbar spine. This accident precipitated symptoms of lower back pain and eventually left leg pain. Although plaintiff continued working as an auto mechanic, he could not consistently perform many of the heavy lifting tasks required in his job due to his ongoing back pain.
79. When plaintiff first saw Dr. Rice, plaintiff did not have radicular symptoms. The first lumbar MRI revealed a disc bulge at L5-S1, consistent with plaintiff's complaints. The repeat MRI results did not indicate a herniated disc (HNP), and it was not until after plaintiff's November 29, 2005 accident, that the HNP was noted. *Page 23 
80. Dr. Rice is of the opinion, and it is found that it is more likely than not, that the second accident of November 29, 2005, when plaintiff slipped and fell, was a significant aggravating factor in plaintiff's lumbar spine injury. Following this accident, his lumbar condition deteriorated more rapidly and severely, to the extent that plaintiff suffered a herniated disc at L5-S1, which eventually required surgery.
81. Dr. Rice testified, and the Full Commission finds, that given plaintiff's back and leg pain, it was a very reasonable decision for plaintiff to stop working as an auto mechanic and look for work in another field. Dr. Rice is of the opinion, and the Full Commission finds, that as long as plaintiff can tolerate the pain, the same treatment regimen for his back will be continued. However, Dr. Rice testified further, ". . . and I think that long term he is going to continue require some form of pain management to control his symptoms, and I think that it is likely that at some point it may get to the point he can't tolerate his symptoms and require further surgery on his back."
82. On November 18, 2009, the parties deposed Dr. Rhyne, who rendered a second opinion as to plaintiff's cervical injury, as an expert in the field of orthopedic medicine with a specialty in the neck and spine. Per Dr. Rhyne, it would be reasonable to conclude that the second accident, plaintiff's slip and fall, could have aggravated plaintiff's prior back injury. However, plaintiff did not complain to Dr. Rhyne of his lower back, and the focus of Dr. Rhyne's assessment was the cervical injury.
83. With regard to the focus of plaintiff's complaints during his medical treatment, the Full Commission is guided by the testimony of Dr. Rice, to the effect that plaintiff's focus was on the most recent injury giving him the most acute problems. After plaintiff injured his neck and shoulder, that became the focus of his complaints. However, plaintiff was still *Page 24 
suffering from increasing lower back and left leg pain. Per Dr. Rice, an injury does not necessarily become immediately symptomatic.
84. Dr. Rhyne's testimony supports plaintiff's assessment that he could not return to work as an auto mechanic. With regard to whether plaintiff could perform the movements required for an auto mechanic, Dr. Rhyne testified that "I wouldn't want him lifting more than about 25 pounds and I wouldn't want him being in an awkward position with his neck twisted either forward or — either flexed or rotated for prolonged periods."
85. Dr. Rhyne testified, and the Full Commission finds, based on plaintiff's continued complaints, it would be appropriate for Dr. Rhyne to re-examine plaintiff. Per Dr. Rhyne, consideration may be given to an anterior discectomy and fusion at one or two levels, as the same may help alleviate plaintiff's symptoms, but may also cause him to have more degenerative changes down the road.
86. Dr. Roy Majors testimony was taken via deposition on December 17, 2009. Dr. Majors is an expert in the field of orthopedic surgery with certification in the shoulder and knee, and performed the two surgeries on plaintiff's shoulder. Dr. Majors rated plaintiff with a total fifteen percent (15%) impairment rating for his left upper extremity, following the two shoulder surgeries.
87. Dr. Majors testified, and the Full Commission finds, that it would be a lifestyle choice for plaintiff to determine whether or not putting up with the pain of doing a certain activity that causes that pain is worth continuing. Per Dr. Majors, although he released plaintiff without restriction, he acknowledged that certain movements could cause plaintiff ongoing pain, such that plaintiff might want to limit such movements. He testified, and the Full Commission *Page 25 
finds, it would be reasonable for plaintiff to look for a job that did not involve overhead awkward positioning with the left shoulder if that caused pain in his shoulder.
88. On January 29, 2010, the parties deposed Dr. Anthony Wheeler, an expert in the field of neurology and pain management with a focus on the treatment of headache pain as it relates to neck pain. He testified, and the Full Commission finds, that the cause of plaintiff's headaches was either the neck pain that plaintiff was having from his second accident, or the neck pain was acting in conjunction with the head (from where plaintiff struck his head on the ground in the second accident) to cause the headaches.
89. Dr. Wheeler testified, and the Full Commission finds, that he tried medication, physical therapy, and injections to help plaintiff's cervicogenic headaches, but plaintiff did not improve appreciably over the two years that Dr. Wheeler treated him. The Botox injections that Dr. Wheeler requested to relieve the headaches were not approved by the carrier. Per Dr. Wheeler, massage therapy and physical therapy were very helpful to plaintiff and he recommended additional massage therapy.
90. Dr. Wheeler is of the opinion, and the Full Commission finds, that the Botox injections are a good option for plaintiff and are definitely worth trying because eighty (80%) percent of patients respond to them. The literature is very favorable on the use of Botox injections with headaches, such that it has been approved by Medicare.
91. Dr. Wheeler testified, and the Full Commission finds, that if plaintiff could get the Botox injections, followed by physical therapy, then plaintiff has a very good chance of getting long-standing benefit.
92. Dr. Wheeler testified, and the Full Commission finds, that more likely than not, plaintiff is going to continue to have headaches and neck pain into the future. Dr. Wheeler *Page 26 
testified, and the Full Commission finds, that the type of retraining that plaintiff was doing was consistent with his recommendations to plaintiff to come up for ideas for re-employment. Dr. Wheeler testified, and the Full Commission finds, that he would recommend that plaintiff get into some work for which he has passion, because that passion will distract from the pain that he experiences.
93. The greater weight of the evidence establishes that plaintiff is in need of further medical treatment to lessen his pain and disability from his compensable injuries. This includes medical treatment for his neck, to include a return appointment and possible surgery with Dr. Rhyne, and a second opinion on treatment options for his neck with Dr. Tim Adamson or some other physician at Carolina Neurosurgery Spine; continued treatment as needed with Dr. Rice for his back injury; continued treatment as needed with Dr. Majors for his left shoulder injury; and continued treatment with Dr. Wheeler for his headaches, to include Botox injections, physical therapy, and massage therapy with his prior masseuse to maximize the relief from the Botox injections.
94. The greater weight of the evidence establishes that plaintiff has not reached maximum medical improvement from all of his compensable injuries, to wit his cervical condition and headaches, and thus he is not yet entitled to make an election of remedies.
95. Defendant Federated engaged in stubborn, unfounded litigiousness in filing the Form 24 in the manner that it did, without reference to any of plaintiff's other numerous compensable injuries, and the effect of the same on plaintiff's wage earning capacity.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following: *Page 27 
 CONCLUSIONS OF LAW
1. On or about August 4, 2004, plaintiff sustained an admittedly compensable injury by accident to his back arising out of and in the course of his employment with defendant-employer when a transmission he was working on fell and he caught it, feeling pain in his lower back. N.C. Gen. Stat. § 97-2(6). At the time, defendant Brentwood was the servicing agent for the self-insured employer for the North Carolina Auto Dealers Association.
2. On or about November 29, 2005, plaintiff sustained an admittedly compensable injury by accident to his head, neck, back, left shoulder and leg arising out of and in the course of his employment with defendant-employer when he slipped and fell backward onto the floor, and a tire that he was carrying hit him in the head. N.C. Gen. Stat. § 97-2(6). Defendant Federated was the carrier on the risk for this injury by accident.
3. As a result of the injury by accident on November 29, 2005, plaintiff's lower back condition was significantly aggravated. Aggravation of a pre-existing condition caused by a work-related injury is compensable under the Workers' Compensation Act. Therefore, the carrier on the second injury, Federated, would be responsible for all compensation and medical benefits for plaintiff's lower back injury, as aggravated by the second injury by accident.Moore v. Federal Express, 162 N.C. App. 292, 590 S.E.2d 461 (2004);Smith v. Champion Int'l., 134 N.C. App. 180, 517 S.E.2d 164 (1999).
4. As a result of the injury by accident on November 29, 2005, plaintiff sustained injury to his neck and left shoulder. Defendant Federated is therefore responsible for all compensable consequences of these injuries. Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003). *Page 28 
5. At various times, both carriers have filed Form 60's regarding the compensability of plaintiff's back injuries. Where one carrier or employer has made payments to the employee pending a final disposition of the claim and it is determined that a different carrier or employer is liable, the Commission may order the liable carrier or employer to make repayment in full or in part to the carrier or employer who has made payments to the employee, pursuant to N.C. Gen. Stat. § 97-86.1. In the discretion of the Full Commission, defendant Federated should be ordered to reimburse defendant Brentwood for all money paid to plaintiff as compensation for temporary total disability after November 29, 2005. In the discretion of the Full Commission, defendant Federated should be ordered to reimburse defendant Brentwood for any medical expenses that may have been paid by Brentwood after November 29, 2005.
6. The greater weight of the evidence shows that as a consequence of the injuries to his left shoulder, head, neck, and back, plaintiff has been unable to return to his prior employment as an auto mechanic. Considering his age, education, work experience, and the limitations due to his work injuries, defendants have failed to establish that plaintiff is capable of finding any other employment earning the same wages as prior to his injury by accident since November 29, 2005. Defendant Federated has failed to show that suitable jobs are available for plaintiff and that plaintiff is capable of securing such a position. The greater weight of the evidence supports the payment of ongoing temporary total disability compensation until further order of the Commission, to be paid by Federated. Defendant Federated's Form 24 should be denied. N.C. Gen. Stat. § 97-29.
7. As a consequence of his injuries by accident, plaintiff requires ongoing reasonably necessary medical treatment, to effect a cure or give pain relief, including, but not limited to the following: medical treatment for his neck, to include a return appointment and possible surgery *Page 29 
with Dr. Rhyne and a second opinion on treatment options for his neck with Dr. Tim Adamson or some other physician at Carolina Neurosurgery Spine; continued treatment as needed with Dr. Rice for his back injury; continued treatment as needed with Dr. Majors for his left shoulder injury; and continued treatment with Dr. Wheeler for his headaches, to include Botox injections, physical therapy, and massage therapy with his prior masseuse to maximize the relief from the Botox injections. N.C. Gen. Stat. § 97-2(19). Little v. Penn VentilatorCo., 317 N.C. 206, 345 S.E.2d 204 (1986).
8. Vocational rehabilitation is considered medical treatment in the workers' compensation context. N.C. Gen. Stat. § 97-2(19);Foster v. U.S. Airways,149 N.C. App. 913, 923, 563 S.E.2d 235, 242 (2002). Based on the greater weight of the evidence, plaintiff is entitled to have defendant Federated pay for his course of study for sonography at South Piedmont Community College as part of his medical and rehabilitative treatment for his compensable injuries because he has established that pursuing this education will best help restore his wage earning capacity and lessen his period of disability. This shall be approved nunc protunc so that defendant Federated will reimburse plaintiff for his tuition and supplies for school to date and ongoing until he graduates.
9. Plaintiff has raised the issue of his average weekly wage for his second injury by accident. During the fifty-two weeks prior to plaintiff's second injury, his wage earning capacity had been diminished because of the lower back pain he was experiencing from the first accident. Therefore, the first method of calculating his wages pursuant to N.C. Gen. Stat. § 97-2(5) would not be appropriate. The second method of calculating his wages pursuant to N.C. Gen. Stat. § 97-2(5) does not apply because plaintiff did not work less than fifty-two weeks prior to his second *Page 30 
injury. The third method does not apply because plaintiff was not employed in a casual manner or for a short time prior to his second injury.
10. Having considered the foregoing, the fourth method under N.C. Gen. Stat. § 97-2(5) should be used, which allows the Commission to use methods of computing average weekly wages which will most nearly approximate the amount which the injured employee would be earning were it not for the injury. The Commission concludes that the method that would most nearly approximate what plaintiff would be earning but for his second injury is the earnings for the fifty-two weeks prior to his first injury by accident on August 4, 2004. Therefore, plaintiff's compensation rate for the second injury by accident should be the same as the average weekly wage for his first injury by accident, which yields the statutory maximum compensation rate of $688.00.
11. In their Form 24 Application and in this proceeding, defendant Federated has not met their burden to show that there are suitable jobs plaintiff is capable of obtaining. Therefore defendants are not entitled to terminate plaintiff's TTD compensation. N.C. Gen. Stat. § 97-18.1.
12. Defendant Federated improperly used the Form 24 process in attempting to cease payment to plaintiff of compensation. Their request was based only upon the one release for return to work, pertaining only to plaintiff's shoulder, and ignoring the restrictions on plaintiff due to his compensable lower back injury, of which Federated was aware, and his restrictions due to his neck injury, of which Federated was also aware, and for which Federated had accepted liability. Federated filed and pursued the Form 24 without a reasonable basis, therefore plaintiff is entitled to an award of attorney's fees under N.C. Gen. Stat. § 97-88.1.
 *********** *Page 31 
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Defendant Federated's Form 24 Application remains DISAPPROVED, and defendant Federated SHALL continue to pay weekly TTD compensation to plaintiff in the amount of $688.00 per week until plaintiff returns to work or further Order of the Commission.
2. Defendant Federated shall pay to plaintiff in one lump sum any arrearage owing him for the difference between the prior compensation rate of $642.86 and $688.00 for all periods for which it has paid plaintiff compensation, subject to the attorney's fee hereinafter approved.
3. Defendant Federated shall reimburse defendant Brentwood for all money paid to plaintiff by Brentwood as compensation for temporary total disability after November 29, 2005. Defendant Federated shall reimburse defendant Brentwood for all money paid for plaintiff's medical treatment after November 29, 2005.
4. Plaintiff's counsel is hereby entitled to, and shall be paid, a reasonable attorney's fee of twenty-five (25%) percent of the lump sum set forth in Paragraph 2 of this award, which shall be paid directly by defendant Federated to plaintiff's counsel in one lump sum.
5. A fee of twenty-five (25%) percent of plaintiff's ongoing compensation for total disability is approved for his counsel, and every fourth (4th) check due plaintiff shall be paid directly to his attorney.
6. Plaintiff is entitled to ongoing medical treatment for his compensable injuries so long as the same tends to effect a cure or provide relief or shorten any period of disability. Defendant Federated shall be responsible for payment for the same, including, but not limited to *Page 32 
the treatments set forth in this Opinion and Award or as approved by the authorized treating physicians, Dr. Rice, Dr. Majors, and Dr. Wheeler.
7. The following are approved and designated as plaintiff's authorized treating physicians: Dr. Rice for his lower back injury, Dr. Majors for his left shoulder injury, and Dr. Wheeler for his headaches.
8. Plaintiff's treating physician for his neck shall not be determined until after he has had a second opinion appointment with Carolina Neurosurgery and Spine.
9. Defendant Federated shall be responsible for payment for plaintiff's course of study with South Piedmont Community Collegenunc pro tunc to the date on which he first began paying money for said schooling and continuing until such time as he completes the medical sonography program.
10. Within twenty (20) days of receipt of this Opinion and Award, plaintiff's counsel shall submit to the Full Commission a petition for an attorney's fee and proposed Order. Plaintiff's counsel should provide an itemization of the time spent on this claim since defendant Federated's filing of their Form 24 Application. Thereafter, the Full Commission will file an Order setting plaintiff's attorney's fee.
11. Defendant Federated and Defendant Brentwood shall each pay one-half of the costs of this action.
This the 24th day of March, 2011.
 S/__________________________ DANNY LEE McDONALD COMMISSIONER *Page 33 
CONCURRING:
 S/__________________________ STACI T. MEYER COMMISSIONER
 S/__________________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1